UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
STARPOINT SOLUTIONS LLC,                   Civil Action No. 18-cv-7131

                        Plaintiff,

     -against-

TRIMFOOT CO., LLC,

                        Defendant.
-------------------------------------------------------------------

## COMPLAINT

Plaintiff Starpoint Solutions LLC ("Plaintiff" or "Starpoint"), appearing by and through its attorneys, Katsky Korins LLP, as and for its Complaint, alleges as follows:

## SUMMARY OF ACTION

1. This is an action to recover monies due and owing by defendant Trimfoot Co., LLC ("Defendant" or "Trimfoot") to Starpoint pursuant to a Professional Services Agreement, a copy of which is annexed hereto as Exhibit 1.

2. Trimfoot initially retained Starpoint to render consulting services to Trimfoot in connection with upgrading and modernizing its computer systems for its business operations. Trimfoot subsequently expanded Starpoint's engagement a number of times through a series of written statements of work to cover additional work.

3. Over a period of approximately ten months, Starpoint performed significant services and delivered to Trimfoot weekly time records and monthly invoices documenting these services. Importantly, Trimfoot never disputed any of Starpoint's particular time records or invoices. Indeed, Trimfoot made partial payments of those invoices, but the outstanding, unpaid balance increased over time. Then, after several months of accepting Starpoint's services,

1

Trimfoot unilaterally chose to abandon the project to upgrade its computer systems and refused to pay Starpoint the balance owed for the services it had rendered. Despite due demand for payment, Trimfoot has failed and refused to remit the balance due of $485,690.03 owed to Starpoint.

## THE PARTIES

4. Starpoint is a limited liability company whose members are citizens of the States of Delaware and Pennsylvania. Starpoint maintains an office at 22 Cortlandt Street, 14th Floor, New York, New York 10007, from which services related to the parties' contract were rendered. Accordingly, Starpoint is a citizen of Delaware and Pennsylvania.

5. Trimfoot is a limited liability company organized under the laws of the State of Missouri and maintains its principal place of business at 115 Trimfoot Terrace, Farmington, Missouri 63640. Upon information and belief, all of Trimfoot's members are citizens of the State of Missouri and none is a citizen of the State of Delaware or Pennsylvania.

## JURISDICTION AND VENUE

6. This Court has jurisdiction by virtue of 28 U.S.C. § 1332 because there is complete diversity of citizenship between Starpoint and Trimfoot and the matter in controversy exceeds the sum of $75,000, exclusive of interest, attorneys' fees and costs.

7. Venue is properly placed under 28 U.S.C. § 1391. The contract at issue expressly provides that any legal action or proceeding arising from or relating to the contract shall be instituted in the United States District Court for the Southern District of New York and that each party irrevocably consents to the Court's jurisdiction over each party.

## FACTUAL BACKGROUND

8. Trimfoot is in the business of designing and selling footwear for infants, children, women, and dance markets.

9. Starpoint is a leading consultancy firm with two main practice areas – Project Solutions and Staffing Solutions. Among other things, it provides business consulting services and advice respecting Enterprise Resource Planning ("ERP"). ERP refers to the systems and software packages used by organizations to manage day-to-day business activities, such as accounting, procurement, project management and manufacturing.

A.   **The PSA and the SOWs**

10. On or about June 2, 2017, Trimfoot retained Starpoint in connection with, among other things, the planning of a new cloud based ERP system for its business operations. In that regard, Starpoint and Trimfoot entered into a Professional Services Agreement dated as of June 2, 2017 (the "PSA").

11. The PSA provides, in relevant part, that:

(a) Starpoint will provide services of the type and at the rates as set forth in statements of work ("SOW") and to the extent there is any inconsistency between the PSA and the SOW, the PSA will control (Section 1);

(b) The fee arrangement for a particular engagement shall be as stated in the respective SOW and if no fee arrangement is stated, the method of compensation will be on a time and materials basis (Section 2);

(c) Weekly record hours worked during that week will be submitted to the client and to the extent that the client fails to sign or otherwise acknowledge the weekly record within three business days, it will be presumed to be accurate and that the client agrees to pay for the time indicated therein (Section 3(a));

(d) Any estimate of cost prepared by Starpoint shall in no event constitute or be construed to be a fixed price agreement between the parties (Section 3(d));

  (e) In the event that the client fails to remit payment within thirty days of the invoice, Starpoint shall have the right to charge interest on any unpaid amount from the due date in an amount equal to the lesser of (i) 1 ½ % per month, or (ii) the maximum amount permitted by law, calculated on a daily basis (Section 3(b)); and

  (f) In the event either party institutes any legal action against the other party, the prevailing party in such action shall be entitled to its reasonable attorney's fees and costs (Section 12(l)).

  12. Simultaneously with entering into the PSA, Trimfoot and Starpoint also executed an initial statement of work dated June 2, 2017 (the "June 2017 SOW"), and thereafter another statement of work with an effective date of September 5, 2017 (the "September 2017 SOW"). In connection with the June 2017 SOW, Starpoint, among other things, reviewed Trimfoot's processes, data management requirements, and system functional capabilities. As a result of its analysis of Trimfoot's operations, Starpoint recommended that Trimfoot utilize cloud-based ERP systems made by Oracle Corporation in Trimfoot's operations.

  13. Pursuant to the June 2017 SOW and the September 2017 SOW, Starpoint agreed that it would provide certain consulting services relating to the ERP project, but that other technical work necessary to complete the project, including, among other things, certain software programming and the development of interfaces between Trimfoot's existing inventory system known as Cadence and the Oracle cloud-based ERP system, would be performed by Trimfoot's own internal information technology personnel.

  14. Over time, however, Trimfoot's own information technology personnel proved unable or unwilling to perform the work, tasks and responsibilities originally assigned to them for the project.

15.     Accordingly, the scope of Starpoint's assignment and work increased over time and Trimfoot and Starpoint executed two additional statements of work: (a) a statement of work with an effective date of October 6, 2017 (the "October 2017 SOW"); and (b) a statement of work with an effective date of January 2, 2018 (the "January 2018 SOW"; together with the June 2017 SOW, the September 2017 SOW and the October 2017 SOW, the "SOWs").  Each of the four SOWs executed by the parties provided that Starpoint would be compensated for its work on a time and materials basis, with the time charges based on specified hourly rates.  The work performed pursuant to the June 2017 SOW, the October 2017 SOW and the January 2018 SOW was to be paid at the hourly rate of $165 per hour, plus reimbursement of expenses.  The work performed by a specifically identified consultant pursuant to the October 2017 SOW was to be paid at the hourly rate of $100 per hour, plus reimbursement of expenses.

16.     Until Trimfoot unilaterally terminated the project and discharged Starpoint, Starpoint substantially performed all of its obligations under the PSA and the SOWs.

B.     **None of the Time Records or Invoices Delivered to Trimfoot Were Timely Objected to by Trimfoot**

17.     In connection with its services under the PSA and the SOWs, Starpoint delivered to Trimfoot its written weekly time records (the "Time Records") and its written monthly invoices (the "Invoices"), evidencing the time and materials it expended in performing Starpoint's services under the PSA and SOWs.

18.     Trimfoot never objected to any of the specific Time Records or Invoices delivered by Starpoint to Trimfoot.  Indeed, most of the Time Records were expressly approved by Trimfoot, while a minority of them was simply not responded to by Trimfoot.

19.     In addition to the Time Records and Invoices, Trimfoot also requested Starpoint provide Trimfoot with written monthly run rate reports that summarized the costs of the project

in a format that Trimfoot preferred. Starpoint provided Trimfoot with the monthly run rate reports that Trimfoot requested. Trimfoot did not object to the monthly run rate reports and accepted those disclosures about the costs of the project without protest.

20.     In addition to accepting without objection the Time Records, Invoices and monthly run rate reports, Trimfoot also made partial payments, also without any protest, on the balance owed to Starpoint. Trimfoot made partial payments to Starpoint totaling $100,001.48.

21.     Starpoint relied on the promises made by Trimfoot in the PSA and in the SOWs and continued to perform services thereunder.

22.     In or about late January 2018, Trimfoot, although not objecting to any specific Invoice or Time Record, expressed concern about the increasing overall cost of the project.

23.     Trimfoot did not, however, instruct Starpoint to cease work or give any notice to terminate the PSA. To the contrary, Trimfoot instead urged Starpoint to continue working on the project, so that it could be completed as soon as possible, while Trimfoot and Starpoint discussed Trimfoot's general concerns about the overall costs.

24.     In accordance with Trimfoot's requests, Starpoint continued working on the project. It also discussed with Trimfoot its concerns about the overall costs. Starpoint also made several proposals to Trimfoot to help reduce the overall costs of the project, none of which proposals were accepted by Trimfoot.

25.     In or about April 2018, Trimfoot abruptly and unilaterally announced that it had decided not to complete the project, not to utilize the Oracle cloud-based ERP system and instead to continue using its existing, legacy ERP systems. Although Trimfoot did not give Starpoint the written termination notice required by the PSA or otherwise comply with the termination provisions of the PSA, Trimfoot told Starpoint to stop work on the project and Trimfoot

announced that it would not pay Starpoint for any of the work previously performed by Starpoint.

26. As of the time when Trimfoot abruptly and unilaterally terminated the parties' contract, Starpoint had performed additional work that incurred another $97,395.00 in time charges that had not yet been formally invoiced to, or paid by, Trimfoot.

27. Except for a total of $100,001.48 in partial payments and approximately $55,000 in courtesy credits that Starpoint agreed to extend as an accommodation to Trimfoot, each of which Starpoint has applied to reduce the balance owed, Trimfoot has failed to pay the remaining balance due to Starpoint of $485,690.03, despite due demand therefor.

## FIRST CAUSE OF ACTION
(Breach of Contract)

28. Starpoint repeats and realleges each and every allegation set forth in paragraphs 1 through 27 above.

29. A contract was formed between Starpoint and Trimfoot.

30. Starpoint duly and substantially performed its obligations under that contract, except to the extent that Trimfoot prevented it from doing so.

31. Trimfoot materially breached that contract by, among other things, failing and refusing to pay Starpoint the amounts owed to Starpoint under the contract, failing to provide the notices required by the contract, and terminating the contract in violation of the provisions governing termination.

32. Starpoint has been damaged by Trimfoot's breaches of contract.

33. By virtue of Trimfoot's breaches of contract, Starpoint has incurred damages in an amount to be determined at trial, but not less than $485,690.03, plus interest as provided in the PSA, costs and disbursements.

## SECOND CAUSE OF ACTION
(Account Stated)

34. Starpoint repeats and realleges each and every allegation set forth in paragraphs 1 through 33 above.

35. Starpoint timely delivered each of its Time Records to Trimfoot.

36. Trimfoot received and accepted each of Starpoint's Time Records.

37. Starpoint timely delivered each of its Invoices to Trimfoot.

38. Trimfoot received and accepted each of Starpoint's Invoices.

39. The Time Records and the Invoices reflect the time, materials, and expenses incurred by Starpoint for services rendered on Trimfoot's behalf and at Trimfoot's request and insistence.

40. Trimfoot did not timely object to the Time Records or the Invoices. Accordingly, Trimfoot is deemed to have acquiesced to the correctness of the Time Records and the Invoices.

41. Trimfoot has failed to remit to Starpoint the balance due under the Time Records and the Invoices.

42. By virtue of the foregoing, an account stated has been created in an amount to be determined at trial, but not less than $388,295.03, plus interest as provided in the PSA, costs and disbursements.

## THIRD CAUSE OF ACTION
(Quantum Meruit)

43. Starpoint repeats and realleges each and every allegation set forth in paragraphs 1 through 42 above.

44. Starpoint performed services at Trimfoot's request in good faith with a reasonable expectation of payment.

45. Trimfoot accepted the benefit of Starpoint's services.

8

46. By reason of its failure to pay Starpoint for services rendered on its behalf, Trimfoot was unjustly enriched.

47. By virtue of the foregoing, Starpoint is entitled to the reasonable value of the services rendered, plus interest as provided in the PSA, and costs. The reasonable value of the services rendered shall be determined at trial, but in no event less than $485,690.03.

## FOURTH CAUSE OF ACTION
(Attorneys' Fees)

48. Starpoint repeats and realleges each and every allegation set forth in paragraphs 1 through 47 above.

49. Pursuant to Section 12(l) of the PSA, in the event that either party institutes legal action against the other party, the prevailing party in such actions shall be entitled to its reasonable attorneys' fees and costs.

50. By virtue of Trimfoot's breaches under the PSA and the SOWs, Starpoint is entitled to collect from Trimfoot all of its reasonable attorneys' fees and expenses in an amount to be determined at trial or in such post-trial proceedings as the Court may direct.

**WHEREFORE**, Starpoint demands judgment against Trimfoot as follows:

A. On the first cause of action, damages in an amount to be determined at trial, but not less than $485,690.03, plus interest as provided in the PSA, costs and disbursements;

B. On the second cause of action, damages in an amount to be determined at trial, but not less than $388,295.03, plus interest as provided in the PSA, costs and disbursements;

C. On the third cause of action, damages in an amount to be determined at trial, but not less than $485,690.03, plus interest as provided in the PSA, costs and

disbursements;

   D. On the fourth cause of action, an award of attorneys' fees in an amount to be determined at trial or at such other time as the Court may direct; and

   E. Such other and further relief as the Court deems just and proper, including Starpoint's costs and disbursements.

Dated: New York, New York
   August 8, 2018

        KATSKY KORINS LLP

        By: /s/ Robert A. Abrams
         Joel S. Weiss
         Robert A. Abrams
        605 Third Avenue
        New York, New York 10158
        (212) 953-6000

        *Attorneys for Starpoint Solutions LLC*